[Cite as *Pontius v. Riverside Radiology & Interventional Assocs., Inc.*, 2016-Ohio-1515.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Kay Lynn Pontius, individually and as executrix for the estate of Todd Pontius, deceased, | : | |
| | : | |
| Plaintiff-Appellant, | : | No. 15AP-906 (C.P.C. No. 10CV-11989) |
| v. | : | (REGULAR CALENDAR) |
| Riverside Radiology & Interventional Associates, Inc., et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

# D E C I S I O N

### Rendered on April 12, 2016

**On brief:** *Leesberg & Valentine, Gerald S. Leesberg,* and *Craig S. Tuttle,* for appellant. **Argued:** *Gerald S. Leesberg*

**On brief:** *Arnold Todaro & Welch, Gerald J. Todaro,* and *Gregory B. Foliano,* for appellees. **Argued:** *Hanna, Campbell & Powell, LLP,* and *Douglas G. Leak*

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Plaintiff-appellant, Kay Lynn Pontius, ("Pontius") both individually and as executrix for the estate of her late husband, Todd Pontius, appeals a judgment of the Franklin County Court of Common Pleas in favor of appellees, Riverside Radiology & Interventional Associates, Inc. ("Riverside Radiology") and Dr. David Zadvinskis ("Dr. Zadvinskis") following a jury trial on alleged medical malpractice. Specifically, Pontius appeals an evidentiary decision of the trial court (which merged with the final judgment) forbidding hearsay testimony regarding statements allegedly made by Dr. Joseph Schultz, ("Dr. Schultz") an employee of Riverside Radiology, to the effect that a computerized tomography ("CT") scan analyzed by the appellees the day before the

No. 15AP-906

decedent's death showed blood clots in his inferior vena cava. For the reasons that follow, we reverse and remand for proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On November 12, 2009, the decedent complained of discomfort urinating and lower abdominal quadrant pain and ultimately came to the Riverside Methodist Hospital Emergency Room ("ER") seeking treatment. Personnel in the ER performed a CT scan of the decedent's abdomen and pelvis. Dr. Zadvinskis was working for Riverside Radiology at the time and was on duty reading whatever films came in. In that capacity he read the decedent's scans. The decedent had a history of deep vein thrombosis ("DVT") and pulmonary embolism ("PE") and had medically installed in his body a filter to catch blood clots before they could enter the heart and lungs. Such clots were arguably visible on the scans of the decedent's vena cava. However, Dr. Zadvinskis had concluded upon reading the decedent's films that, other than the presence of the filter, the scan images were essentially normal.

{¶ 3} Another doctor, Dr. Warren Yamarick, shared the results of the scan and Dr. Zadvinskis' reading of them with the decedent and his wife. Thereafter, Dr. Yamarick prescribed an antibiotic for a possible urinary tract infection and pain pills and sent the decedent home from the hospital. The following morning, the decedent collapsed in the shower at home and died of what an autopsy later revealed was a pulmonary embolism.

{¶ 4} On August 13, 2010, Pontius filed a complaint against Dr. Zadvinskis, Riverside Radiology, OhioHealth Corporation, and various John Doe health care entities for several claims which, collectively, amount to medical malpractice allegations. The parties engaged in extensive discovery and motion practice over the course of approximately five years. In the course of discovery, questions emerged about whether a doctor employed by Riverside Radiology other than Dr. Zadvinskis had reviewed the decedent's scans and offered a differing opinion on what the scans showed.

{¶ 5} Judy Pontius, mother of the decedent, testified in deposition that she spoke to her son three times the day before his death and was aware that he had been at the ER, had been given a CT scan, and had been sent home with a prescription. A few days after his death, while she was holding calling hours for her son, Bruce Soulsby, ("Soulsby") the golf pro and golf director at the local country club to which her son had belonged, introduced her to another country club member, Dr. Joseph Schultz. Dr. Schultz was a

No. 15AP-906

radiologist employed by Riverside Radiology and had the ability to view the decedent's CT scans. According to the testimony of Judy Pontius, Dr. Schultz seemed "concerned" about the case, said he would look at the scans, and promised, "I will get back with you, we will get to the bottom of this." (Judy Pontius Deposition, 26.)

{¶ 6} The golf pro, Soulsby, also sat for a deposition. He testified that he knew the decedent and his family very well, had taught the decedent's children golf, played golf with the decedent often, and, in fact, had been scheduled to golf with him on the afternoon of his death. Consequently, Soulsby went to the funeral home to pay his respects and happened to speak there with Dr. Schultz and Judy Pontius. He testified that Dr. Schultz spoke consolingly to the decedent's family and said he would look at the decedent's CT scans and see what he could see. According to Soulsby, a few days later Dr. Schultz came to Soulsby's office at the country club and Dr. Schultz revealed to him in confidence that the CT scans had indeed showed clots built up behind the vena cava filter and on the side of the filter. Soulsby further testified that Dr. Schultz revealed to him that in the wake of the decedent's passing, Dr. Schultz had met with two other doctors at Riverside Radiology and had given them his opinion about the case–to the effect that the original review of the CT scans had missed the clot. Soulsby testified that Dr. Schultz had told him candidly that they "blew it" and that "Todd [the decedent] should be here today." (Soulsby Deposition, 14-15.) Soulsby testified that he relayed this information to the decedent's wife, and her deposition testimony confirmed that Soulsby indeed related the information to her about the alleged statements by Dr. Schultz.

{¶ 7} In addition, the decedent's family doctor, Dr. Joseph Carducci, who was also a member of the country club, testified in deposition that he knew Dr. Schultz both from the club and from his professional life. Dr. Carducci testified that he was a witness to a conversation in which Dr. Schultz explained that he had looked at the CT scans taken of the decedent, and in his opinion, there was a clot evident on the scan images.

{¶ 8} Dr. Schultz also testified in a deposition. He explained that he was with Riverside Radiology from 1977 to 2011 and was a part-time employee at the time of the decedent's death in 2009. At the relevant time he was board certified in radiology and licensed to practice medicine. His job duties included interpreting the whole panoply of radiology images including CT scans and also to peer-review the work of other

No. 15AP-906

radiologists to ensure quality. He denied doing an official review of the work in the decedent's case. He denied that the decedent was a friend of his but admitted that they had played golf together on a number of occasions. He also appeared to deny closeness with Soulsby but admitted that he went on a number of golf trips with Soulsby and other club members to, for instance, Scotland, Ireland, Pebble Beach, and Whistling Straits.

{¶ 9} Dr. Schultz testified that he went to the funeral home for the decedent's viewing hours. He also admitted, though he insisted he did not want to, that he met and had a conversation with Soulsby and the decedent's mother, Judy Pontius, at the funeral home. He testified that he felt the decedent's mother was a "gold digger," potentially litigious, and felt uncomfortable about the fact that even during the viewing hours, so soon after her son's death, she seemed to be implying that someone was at fault for the decedent's death. (Schultz Deposition, 42.) However, Dr. Schultz admitted that he agreed to look at the CT scan images, if only to escape from the uncomfortable conversation.

{¶ 10} Under questioning, Dr. Schultz initially suggested that other personnel at Riverside Radiology may have had access to his personal log-in information and so not all records showing that his ID had accessed the CT scans for the decedent would necessarily pertain to him. However, he admitted that he had no explanation as to who would possibly have been using his ID or why. He also admitted that he looked at the decedent's CT scans on several occasions in the days following the viewing. Ultimately, when questioned, Dr. Schultz admitted that he looked at the CT scans of the decedent seven times, four of which were on the day after the viewing. Dr. Schultz testified that he saw nothing unusual on the scan images on the first viewing or any of the times he studied the scans. He testified, however, that he never reached out to the decedent's mother to reassure her that the CT scans showed nothing amiss to comfort her or dissuade her from engaging in litigation. He admitted that he spoke to Soulsby about the scans in Soulsby's office but maintained that the discussion had begun when Soulsby pinned him down in the pro shop, and he testified that he had told Soulsby that there were no clots. He admitted that he drew a diagram for Soulsby showing the inferior vena cava filter but maintained that he never said there were clots forming behind it or on the side of it.

{¶ 11} On June 15, 2015, Dr. Zadvinskis and Riverside Radiology filed a motion in limine requesting that the trial court forbid the introduction of evidence that Dr. Schultz

No. 15AP-906

had said that there were clots evident on the decedent's CT scans. This motion was based on the argument that testimony by Soulsby or Dr. Carducci to that effect would constitute inadmissible hearsay. At a hearing on August 3, 2015, the trial court orally granted the motion. Following that ruling, on August 6, 2015, Pontius filed a written proffer summarizing the testimony that would have been introduced at trial had the trial court not granted the motion in limine. On August 10, 2015, at the start of trial, but outside the presence of potential jurors, Pontius again proffered arguments and evidence that would have been presented on the issue of Dr. Schultz's alleged admissions. The trial court reaffirmed its ruling of August 3, 2015.

{¶ 12} Following an unfavorable verdict on August 20, 2015, and a corresponding final judgment entry on August 31, 2015, Pontius, on September 29, 2015, filed a notice of appeal.

## II. ASSIGNMENT OF ERROR

{¶ 13} Pontius asserts a single assignment of error for our review:

> The trial court erred in concluding as a matter of law that statements made by [Riverside Radiology's] employee did not qualify as party admissions pursuant to Evid.R. 801(D)(2), and thus evidence with regard to such statements was inadmissible, solely because the declarant disputed the substance of those out-of-court statements.

## III. DISCUSSION

{¶ 14} " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" and is generally a forbidden form of evidence. Evid.R. 801(C); Evid.R. 802. However, "[a] statement is not hearsay if * * * [t]he statement is offered against a party and is * * * a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Evid.R. 801(D)(2)(d).

{¶ 15} This court has previously applied an "abuse of discretion" standard in considering whether a statement constitutes hearsay pursuant to Evid.R. 801(D)(2)(d). *Thomas v. Columbia Sussex Corp.*, 10th Dist. No. 10AP-93, 2011-Ohio-17, ¶ 17-18; *see also State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 92 (considering whether statements met an hearsay exception and noting that "[t]he decision whether to admit []

No. 15AP-906

hearsay statements [is] within the trial court's discretion"); *State v. Canada*, 10th Dist. No. 14AP-523, 2015-Ohio-2167, ¶ 27 ("As with other evidentiary rulings, the determination whether hearsay statements are subject to exception rests within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion."). However, "we note that no court has the authority, within its discretion, to commit an error of law." *State v. Akbari*, 10th Dist. No. 13AP-319, 2013-Ohio-5709, ¶ 7, citing *State v. Beechler*, 2d Dist. No. 09-CA-54, 2010-Ohio-1900, ¶ 70; *see also Neff Sand & Gravel, Inc. v. Great Lakes Crushing, Ltd.*, 11th Dist. No. 2012-L-145, 2014-Ohio-2875, ¶ 23 (stating that de novo review is applied to the question of whether a statement is hearsay). We therefore review the decision of the trial court for abuse of discretion with the understanding that if the trial court erred on a question of law, even with respect to an evidentiary issue, that such is an abuse of discretion.

{¶ 16} In this case, Pontius sought to introduce testimony by Dr. Carducci and Soulsby to the effect that they had heard Dr. Schultz say that, based on his review of the decedent's CT scans, there were clots built up behind the inferior vena cava filter and on the side of the filter, that they "blew it," and that "Todd [the decedent] should be here today." (Soulsby Deposition, 14-15.) Such statements are "statement[s], other than [those] made by [Dr. Schultz] * * *, offered in evidence to prove the truth of the matter asserted," that there were, in fact, clots visible on the CT scans and that Appellees did "bl[o]w it." (Soulsby Deposition, 14.); Evid.R. 801(C). Thus, in preliminary analysis, the testimony sought would have been a classic example of hearsay.

{¶ 17} However, "[a] statement is not hearsay if * * * [t]he statement is offered against a party and is * * * a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Evid.R. 801(D)(2)(d). The statements of Soulsby and Dr. Carducci about the fact that there were clots visible on the CT scans that went undetected by Riverside Radiology, a defendant in the litigation, were to be "offered against a party." *Id.* Moreover, the statement to be offered was that of Dr. Schultz, who was an employee of Riverside Radiology at the relevant times. Thus, the statements were "by the party's * * * servant" and "made during the existence of the relationship." *Id.* The only remaining

No. 15AP-906

question then, is whether the statements made "concern[ed] a matter within the scope of the agency or employment." *Id.*

{¶ 18} In the context of whether a statement "concern[ed] a matter within the scope of the agency" this court has previously held, "[f]or a statement to qualify as an admission of a party-opponent, the agency relationship need not encompass authority to make damaging statements but requires only the authority to take action concerning the subject matter of the statements." *Mowery v. Columbus*, 10th Dist. No. 05AP-266, 2006-Ohio-1153, ¶ 59, citing *Ball v. Consol. Rail Corp.*, 142 Ohio App.3d 748, 756 (8th Dist.2001); *Pappas v. Middle Earth Condominium Assn.*, 963 F.2d 534, 538 (2d Cir.1992); *see also Sleeper v. Casto Mgmt. Servs.*, 10th Dist. No. 12AP-566, 2013-Ohio-3336, ¶ 17-18; Evid.R. 801(D)(2)(d). Whether statements "concern[ed] a matter within the scope of the * * * employment," is not a matter of whether the employee was acting according to the direction of their employer in the moment that the statements were made, but rather whether the statements concerned "subject matter" upon which the employee had "authority to take action." *Mowery* at ¶ 58; Evid.R. 801(D)(2)(d)

{¶ 19} Dr. Schultz testified that he was with Riverside Radiology from 1977 to 2011 and was a part-time employee at the time of the decedent's death in 2009. At the relevant time he was board certified in radiology and licensed to practice medicine. His job duties included interpreting the whole panoply of radiology images including CT scans and also to peer-review the work of other radiologists to ensure quality. On this record and considering the liberal standard set forth in *Mowery*, we find that comments by Dr. Schultz about CT scans he reviewed while at work, on his workstation, regarding a patient whose imaging had been evaluated by another doctor with Riverside Radiology, were statements made "concerning a matter within the scope of the agency or employment." Evid.R. 801(D)(2)(d). Although Dr. Schultz denied that his view of the CT scans of Todd Pontius was an official review of the work in decedent's case, his testimony establishes that he was sometimes asked to review the work of other doctors, and, thus, such work was within the scope of his employment even if he lacked a specific directive from his employer to review the decedent's particular case.

{¶ 20} Under an abuse of discretion standard, we would tend to defer to the trial court's determinations upon the admissibility of evidence to be heard by a jury at trial in

No. 15AP-906

reviewing whether Evid.R. 801(D)(2)(d) is satisfied. A review of the record of the trial court's hearings on this evidentiary question and relative to Pontius' assignment of error indicate that the trial court erred as a matter of law and thereby abused its discretion in granting appellees' three related motions in limine.[1] At the August 3, 2015 hearing, when the trial court was presented with extensive arguments for and against why Evid.R. 801(D)(2)(d) and related case law did or did not support presenting to the jury evidence relating to and the testimony of Dr. Schultz, Soulsby, and Dr. Carducci,[2] the trial court did not discuss the evidentiary rule or any rule of evidence. Rather, it simply stated, "I'll grant the motion." (Aug. 3, 2015 Tr., 58.)

{¶ 21} Later, during the August 3, 2015 pre-trial hearing, the trial court reiterated upon further inquiry from Pontius that its position was unchanged and that the evidence Pontius sought to introduce would not be heard at trial.

> [PLAINTIFF'S COUNSEL]: We have -- we have a question
> about the scope of the court's ruling on Dr. Schultz, which was

---

[1] Appellees' motions in limine relevant to Pontius' assignment of error were as follows: (1) Motion filed June 15, 2015, entitled, "Motion in Limine on Behalf of Defendants, David Zadvinskis, M.D. and Riverside Radiology and Interventional Associates, Inc., to Exclude All Testimony Regarding Any Out of Court Statements Allegedly Made by Joseph Schultz, M.D." (granted on August 3, 2015); (2) Motion filed June 15, 2015, entitled, "Motion on Behalf of Defendants, David Zadvinskis, M.D. and Riverside Radiology and Interventional Associates, Inc., to Exclude Audit Logs" (found moot on August 3, 2015); (3) Motion filed June 16, 2015, entitled, "Motion on Behalf of Defendants, David Zadvinskis, M.D. and Riverside Radiology and Interventional Associates, Inc., to Add Joseph Carducci, M.D. to Defendants' Motion in Limine to Exclude All Testimony Regarding Any Out of Court Statements Allegedly Made by Joseph Schultz, M.D." (August 10, 2015 prior to the start of the trial).

[2] Highlights of the trial court oral argument on the motions in limine include:

> [PLAINTIFF'S COUNSEL]: What we're talking about here fundamentally is Evidence Rule 801(D)(2), party admissions * * * But what we're talking about with party admissions is a three-part test * * * you need not have authority to make a party admission. Otherwise, no negative statement about any employer would ever be admissible in any court of law * * * what we're talking about here is a statement that goes to the heart of the case * * * this case is about what is shown on that CT scan, period. Dr. Schultz's statement answers that question directly, and that statement is why we're here today. That statement made its way to the plaintiff, she found her way to a lawyer, and we find ourselves here. And jurors constantly find themselves asking, why would anyone sue? Why would someone go after a doctor? What would possess them to do that? And in this case we have an answer and they don't want the jury to know that.
>
> THE COURT: I'll grant the motion.

(Aug. 3, 2015 Tr., 57-58.)

No. 15AP-906

> to eliminate -- which was a motion in limine to prevent us from calling Dr. Schultz.
>
> THE COURT: Well, I don't want Dr. Schultz coming in here and talking about talking to a golf pro, or he went in to look and see, and he found out, and here it is and all that. I don't want any of that.
>
> [PLAINTIFF'S COUNSEL]: Is -- is the plaintiff going to be allowed to testify about the fact that she was told that the defendant's partner advised them that the [CT] scan had been misread?
>
> THE COURT: No.

(Aug. 3, 2015 Tr., 91-92.)

{¶ 22} Further, at the start of the trial, on August 10, 2015, when Pontius renewed their request that the trial court reconsider permitting the jury to hear evidence and testimony from these witnesses, the trial court gave a more expressive explanation, none of which took into account Evid.R.801(D)(2)(d):

> [DEFENDANTS' COUNSEL]: Your Honor, so here's what concerns me. The question about, that we argued at length, was the admissibility of the statements by -- not the admissibility of Dr. Schultz's statements initially, it's the admissibility of the statements allegedly made by him that would come in through Soulsby and Dr. Carducci and whether it was an admission against interest. There was a ruling on that issue.
>
> The question then becomes whether the plaintiff can call Dr. Schultz in their case-in-chief, and we argued -- we briefed that issue, that if they know what they know now, they can't call him to put him up there under the pretext of then impeaching his credibility.
>
> THE COURT: Right.
>
> [DEFENDANTS' COUNSEL]: So I'm not sure what it is that we're going to re-review. Are we going to review the whole issue whether there's an admission against interest? Are we going to review the issue of whether they can call the doctor, force him to -- or have him say what he said [in the deposition], and then impeach him with the testimony of Bruce Soulsby?
>
> THE COURT: No.
>
> [PLAINTFF'S COUNSEL]: My --
>
> THE COURT: We're not doing that.

No. 15AP-906

[DEFENDANTS' COUNSEL]: So what -- I'm not clear about what we're doing.

[PLAINTFF'S COUNSEL]: We're not doing what, Your Honor?

THE COURT: We're not going to impeach him with the golf pro.

[PLAINTFF'S COUNSEL]: Well, if we don't call -- we don't need [Dr.] Schultz as a witness in this case.

THE COURT: Right.

[PLAINTFF'S COUNSEL]: We don't need him. The question is whether or not Bruce Soulsby and Dr. Carducci can testify about what they were told by an employee/colleague of Dr. Zadvinskis.

THE COURT: No, that -- that I will not permit.

[PLAINTFF'S COUNSEL]: Okay. Because that -- that is -- is that -- just for clarification, is that because Dr. Schultz is now denying under oath that which he is purported to have said before he was put under oath?

THE COURT: Well, I think that that -- I think all along that that has been a problem with respect to what he has told others. I will not permit it based upon that. But --

[PLAINTFF'S COUNSEL]: Here's my --

THE COURT: The fact that he has denied it now I think precludes the testimony of all of it.

[PLAINTFF'S COUNSEL]: Okay.

THE COURT: I didn't realize -- when I started this this morning, I didn't realize there was a videotape deposition that he said adamantly he never said that.

[PLAINTFF'S COUNSEL]: Okay. So -- so I understand the court's ruling, *if somebody makes an admission against interest outside of a court proceeding and then is put under oath and asked to affirm having made that statement, if they deny it, it's the court's view that nobody's allowed to testify that that statement was in fact previously made?*

THE COURT: *Whatever ruling I made Monday with respect to all of that now stands*, and so we're -- actually we're done[.]

(Emphasis added.) (Aug. 10, 2015 Tr., 6-9.) Discussion followed relating to a voir dire of Dr. Schultz to see if he would confirm in his testimony that "he saw a clot in the blood -- on the CT scan, that the court would be willing to entertain us doing that with a voir dire

No. 15AP-906

of him first *to find out whether he was going to say that*," and the trial court stated, "That's what I said at the ultimate end." (Emphasis added.) (Aug. 10, 2015 Tr., 9.)

{¶ 23} While counsel for the appellees characterized the trial court's ruling on their motions in limine as being based in Evid.R.801(D)(2)(d), the trial court never discussed on August 3, 2015 why it stated, "I'll grant the motion." (Aug. 3, 2015 Tr., 58.) By August 10, 2015, at the start of trial, even counsel for appellees characterized the trial court's basis for disallowing the testimonies of Drs. Schultz and Carducci, Soulsby and evidence of log-ins to the medical records of the decedent, as being based on (1) whether Dr. Schultz would testify differently from his deposition testimony (which denied his earlier statements to Soulsby and Dr. Carducci) and (2) whether Dr. Schultz could be impeached if he testified at trial consistent with his deposition testimony, with the testimony of Soulsby, Dr. Carducci, and computer log-in information from his employer's records.

{¶ 24} Based on these trial transcripts, we are left with no other impression than that the trial court either failed to apply Evid.R.801(D)(2)(d) or misapplied it. Either way, the trial court erred as a matter of law. In doing so, the trial court abused its discretion, having determined that the only testimony that the jury could hear was testimony from Dr. Schultz that was inconsistent with his deposition testimony or that would, in fact, corroborate what the excluded witnesses and related evidence would say. Despite having heard arguments concerning the three factors to be considered in determining whether Evid.R.801(D)(2)(d) supplied the trial court with a legal exception to the hearsay rule, the trial court pre-weighed the evidence, according more weight to Dr. Schultz's deposition testimony under oath than to his actions and out-of-court statements that should have been presented to the jury as an admission against interest by Riverside Radiology under Evid.R.801(D)(2)(d).

{¶ 25} That Dr. Schultz later equivocated in his deposition from previous, out-of-court statements was not a proper basis for excluding hearsay evidence of his earlier statements. Moreover, hearsay was not the only evidence of what Dr. Schultz did. He also admitted in his deposition testimony, and hospital records confirmed, that his unique identification was used at least seven times to access the files containing the decedent's radiology records. The evidence of his actions actually supported applying

Evid.R. 801(D)(2)(d) to hearsay testimony that should not have been excluded by the trial court. All of this evidence should have been introduced before the jury, whose province as trier of fact was to determine each witness' credibility and to weigh the evidence in reaching its verdict. Counsel for Pontius could not have been clearer on this point when he argued to the trial court that a jury was likely to ponder why this case ever was filed in the first instance and that Dr. Schultz's prior statements, as admissions against Riverside Radiology's interest, went to the heart of the case. Pontius was unable to present the testimony of Dr. Carducci as to what he learned from Dr. Schultz post-CT scans review and were unable to cross-examine Dr. Schultz with this evidence or with the testimony of Soulsby. As a result, the jury was denied the opportunity to fully adjudge all admissible evidence sought to be offered by Pontius or to properly weigh it in reaching its verdict.

{¶ 26} Appellees argue that any such error is harmless. The record does not contain a transcript of the full trial and thus we cannot determine whether the evidence presented at trial was so much in favor of the appellees that the exclusion of this testimony had no effect on substantial justice.[3] *See* Civ.R. 61. However, even taking appellees' assertions at face value, that fact that Pontius' four experts testified that clots were evident on the CT scans while appellees' expert and Dr. Zadvinskis both testified that clots were not visible, we find it impossible to conclude that the jury's analysis would not have been affected to some extent by testimony that a radiologist employee of Riverside Radiology had stated that there were clots evident on the CT scans, that they "blew it," and that "Todd [the decedent] should be here today." (Soulsby Deposition, 14-15.) This conclusion, of course, is also presumably why appellees objected to introduction of the evidence in the first place.

{¶ 27} Appellees also argue that Pontius has not appropriately preserved the evidentiary issue for this court's review. After appellees filed their motion in limine on June 15, 2015, counsel for Pontius briefed the matter in writing, argued orally at a hearing on August 3, 2015, proffered evidence in writing on August 6, 2015, and gave renewed argument on the issue on August 10, 2015 at the start of trial. While we appreciate that

---

[3] The transcript that was included in the record is a partial transcript of the trial, including a transcript of the hearings on the relevant motions in limine. Appellees did not supplement the transcript to support with any additional trial testimony their arguments of harmless error. What we do have in the record is sufficient to support our decision.

No. 15AP-906

decisions on motions in limine are interlocutory and objections to granting them should be renewed at trial in order to ensure that the evolution of the case has not given cause for the trial court to reconsider the matter, a party is not required to make repetitive renewals of the issue throughout the trial.  Appellees chose to move in limine rather than to object at trial. When the trial court granted appellees' motion in limine, its decision was comprehensive in nature. Continuing to seek a change in the trial court's decision to deny introduction of such excluded evidence was not required. Moreover, Pontius adequately preserved the error for review with her counsel's efforts to seek clarification more than once, to elicit the trial judge's reasoning for granting the motion in limine and in filing a written proffer.

{¶ 28}  Pontius' single assignment of error is sustained.

## IV.  CONCLUSION

{¶ 29} In excluding statements by other witnesses and related evidence about statements made by Dr. Schultz concerning matters within the scope of Dr. Schultz's employment with Riverside Radiology, the trial court erred as a matter of law in reaching its evidentiary determination and thereby abused its discretion.  The jury was denied an opportunity to consider the wrongly excluded evidence in reaching its verdict. Evid.R. 801(D)(2)(d).  The error of the trial court was not harmless, and the objection to the exclusion of such evidence was properly preserved.  We sustain Pontius' sole assignment of error and reverse the judgment of the trial court, remanding this case for retrial in accordance with this decision to the Franklin County Court of Common Pleas.

*Judgment reversed and cause remanded.*

TYACK and HORTON, JJ., concur.

————————————